# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# SOUTHERN DIVISION
# AT LONDON

**CIVIL ACTION NO. 13-47-DLB**

**ROGER L. BLANKEN**                                                               **PLAINTIFF**

vs.                       **<u>MEMORANDUM OPINION & ORDER</u>**

**KENTUCKY HIGHLANDS**
**INVESTMENT CORPORATION, et al.**                              **DEFENDANTS**

\*\*\*    \*\*\*    \*\*\*    \*\*\*

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss, (Doc. #9). Plaintiff's claims depend on his allegedly superior interest in a piece of property. In their various filings, Defendants have argued, sometimes persuasively so, that Plaintiff possessed, at most, a claim inferior to that possessed by Defendants. If that is true, Plaintiff's have no valid claims to the property in dispute.

For the reasons stated below, the Court accepts some, but not all, of the arguments advanced in Defendants' filings. Accordingly, Defendants' Motion (Doc. # 9) will be **granted in part** and **denied in part**.

## II. FACTUAL BACKGROUND

This case revolves around a "roll forming machine"–characterized in Plaintiff's filings as the "Blanken equipment" and in Defendants' as a "Roll Former." (Doc. #14-1, at 2; Doc. #16, at 1). A roll forming machine is a large piece of manufacturing equipment which

1

bends long pieces of metal into various shapes and sizes depending on the commercial need. The equipment is expensive. In the present matter, the roll forming machine in question has a value of approximately $750,000. (Doc. #14-1, at 9).

In 1999, LEEP, Inc. purchased a roll former with financing provided by Wells Fargo. (Doc. #18-1). Though the financing agreement is structured as a traditional lease, with Wells Fargo owning the equipment and LEEP renting it, the lease agreement contained a provision that allowed LEEP to purchase the roll former at the end of the lease term for only $1. (Doc. #18-1, at 4). In their Motion to Dismiss, Defendants correctly argue that this kind of a sham lease is considered a traditional secured agreement under the Uniform Commercial Code. (Doc. #9, at 4). Plaintiff admitted as much in his response. (*See* Doc. #14-1 at 7) ("Wells Fargo possessed a perfected security interest in the Blanken Equipment."). Thus, LEEP purchased a roll former, Wells Fargo financed the purchase, and Wells Fargo filed a financing statement on September 21, 1999. (Doc. #18-3, at 45). LEEP had possession of the roll former for many years and used it in the course of business.

On July 29, 2004, LEEP entered into a financing agreement with Fortress Credit Corp. (Doc. # 1-7). That agreement gave Fortress a security interest in LEEP's assets, including its equipment. (Doc. #1-7). Notably, the agreement defined property excluded from the agreement as "any contract, lease, license, or other agreement" that contained provisions restricting assignability. (Doc. #1-7, at 7).

As early as August 2004, LEEP began to fall behind on its payments to Wells Fargo. Shortly thereafter, Wells Fargo filed another financing statement in Oregon to maintain its perfected security interest. (Doc. #1-8). The record indicates that some efforts were

2

made to adjust or delay the lease payments over the next few years. Yet in an April 21, 2008 letter, Wells Fargo notified LEEP that it had defaulted on its roll former payments. (Doc. #18-5, at 24). A few weeks later, on May 8, Wells Fargo sued LEEP in the Middle District of Pennsylvania for breach of contract. (Doc. #18-4). Wells Fargo settled with LEEP on August 8, 2008 on the condition that LEEP pay Wells Fargo $125,000 within ninety days of settling; the agreement ("the agreement") also provided that if LEEP did not pay Wells Fargo, the district court would enter a consent judgment against LEEP. (Doc. #18-5, at 32-35).

On November 6, ninety days after the parties entered the settlement agreement, multiple transactions transpired. According to Plaintiff, these were all part of the same agreement between Wells Fargo, LEEP, and Blanken. (Doc. #32, at 5). As part of this transaction (the "November 6 transaction")[1] Wells Fargo assigned its security interest to Roger L. Blanken, the Plaintiff in this case, for $125,000. (Doc. #1-9). This extinguished Wells Fargo's interests in the roll former. Blanken and LEEP also amended the security agreement to reduce LEEP's monthly payments. (Doc. #1-10). This Second Amendment to Lease eliminated LEEP's purchase rights and made Blanken the owner of the roll former. (Doc. #1-10, at 2).

What's relatively obvious is that the parties to the November 6 transaction didn't appreciate its legal consequences. Until this litigation, they apparently never understood that Wells Fargo was never the true owner of the roll former but rather the possessor of a

---

[1] The parties' filings indicate some disagreement about the nature of the agreements executed on November 6. Referring to these agreements collectively as the "November 6 transaction" should not be taken as an endorsement of one party's view.

security interest in property that LEEP owned. Those parties assumed that Wells Fargo owned the roll former, and then negotiated in ways that transferred Wells Fargo's "ownership" to Blanken. Because of this dissonance, Plaintiff' arguments don't easily fit within the UCC: they're trying to fit a square peg (the language used during the November 6 transaction) into a round hole (the UCC).

### III. ANALYSIS

#### A. Standard of Review

In reviewing a Rule 12(b)(6) motion to dismiss, this Court must "accept all the ... factual allegations as true and construe the complaint in the light most favorable to the [p]laintiff." *Hunter v. Sec'y of U.S. Army* , 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Gunasekera v. Irwin* , 551 F.3d 461, 466 (6th Cir. 2009)). "When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998).

#### B. The Fortress-LEEP security agreement did not exclude the roll former

##### 1. The plain meaning of the exclusionary clause relates to commercial agreements, not manufacturing equipment.

Plaintiff devotes a lot of space to this issue, arguing that the exclusionary provision of the Fortress-LEEP security agreement applies to the roll former. The contested provision reads, in its entirety, as follows:

> Excluded property shall mean any contract, lease, license, or other agreement that contains a provision prohibiting the assignment or grant of a security interest therein without the consent of another Person to the extent (but only to the extent) that such consent has not been obtained and the prohibition either exists on the date of this Agreement and has been disclosed to the Administrative Agent in writing or, after the date of this Agreement, is included in such contract, lease, licence, or other agreement

4

with the prior written consent of the Administrative Agent (other than any of the foregoing constituting an account or a general intangible for money due or to become due to which Section 9-407(a), 9-408(a) or 9-409(a) of the UCC applies).

(Doc. #1-7, at 7). The financing agreement provides elsewhere that the collateral securing LEEP's obligation to Fortress excepts "excluded property." (Doc. #1-7, at 33-34). And if Fortress had no security interest in the roll former, it couldn't assign that interest to Kentucky Highlands Investment Corporation (KHIC). So the crucial interpretive issue is whether the roll former falls within the meaning of "excluded property" as defined above. Plaintiff correctly notes that the Wells Fargo-LEEP financing agreement prohibits later encumbrances on the roll former, so one part of the "excluded property" definition is met. The more difficult question is whether a roll former is a "contract, lease, license, or other agreement." There is little doubt that the answer is "no."

Under New York law,[2] "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002). The Court has little doubt what is meant by a "contract, lease, license, or other agreement," and a "roll former" is none of those things.

Ultimately, the plain meaning of this contract is obvious: the roll former is not covered by the exclusionary clause because the text of the clause excludes any "contract, lease, license, or *other agreement*...", (Doc. #1-7, at 7) (emphasis added). The "other agreement" catch-all indicates that the clause covers commercial agreements–not

---

[2] The parties appear to agree that the Court must apply New York law to their dispute.

manufacturing equipment.  The text of the clause could not be clearer: it does not exclude manufacturing equipment, so Fortress gained a security interest in the roll former.

In their various filings, Plaintiff musters a number of arguments to justify departure from the contract's plain meaning.  But each of these efforts fail.

Plaintiff contends that the Court must interpret contract language in a way that avoids making that language superfluous.  *Suffolk Cnty. Water Auth. v. Vill. of Greenport,* 21 A.D.3d 947, 948 (N.Y. App. Div. 2005).  And, as Plaintiff sees it, to interpret the excluded property provision in a way that doesn't include the roll former is to render that provision meaningless.  "[T]o exclude from collateral the paper that expresses an agreement while leaving subject to the lien the tangible product of an agreement makes no practical sense."  (Doc. #15, at 6).

This argument is misplaced.  It's easy to imagine how a secured contract or lease could have value separate from the underlying collateral. Take, for example, a contract for a sale of automobiles.  The contract itself has its own kind of benefits–the right to payment upon delivery of goods.  A person might want to have a security interest in the automobiles without having a security interest in the right to payment.  If, as Plaintiff asserts, an interpretation that views a contract for a sale of equipment differently from the equipment itself renders the terms of the contract superfluous, then many contracts envisioned by the UCC are superfluous.  The Court cannot endorse this view.

Uncharitable as it sounds, the Court is left to conclude that Plaintiff's argument is based entirely on a misunderstanding of a certain type of commercial transaction.  For example, Plaintiff points to the UCC's definition of a contract–"the total legal obligation that results from the parties' agreement"–and goes on to argue that a security interest in a

6

contract "provides little real security without resort to the equipment [the contract] concerns." But this is just wrong. A secured interest in a contract would give the secured party rights to the contract's payments as collateral. That provides quite a bit of security.

Plaintiff counters that when applied to Wells Fargo-LEEP roll former agreement, the exclusionary clause would not have protected LEEP's rights to *receive* payments, but only their rights to *make* payments. Plaintiff then argues that, by this reading of the excluded property clause, the clause excluded nothing of value to Plaintiff. (Doc. #38, at 6-8). Plaintiff thinks that Defendant's interpretation preserves only LEEP's "right" to pay. Whatever Defendant's position on the matter, it is clear that an agreement keeping LEEP on the hook for payments is hardly a valuable benefit of exchange. The Court fails to see this issue's relevance, however. The Court is unconvinced that the exclusionary clause must apply to the roll former in a way that benefits Plaintiff. The exclusionary clause is part of a long-term financing agreement. It might apply to LEEP's other property, or it might apply to property in the future that LEEP has not yet acquired.

Viewed as such, the plain language of the exclusionary clause does not lead to any commercially unreasonable results. Imagine, for example, two parties, C and D. D is the owner of, among other things, a broadcast license. C takes a security interest in D's property, subject to an exclusionary clause identical to the one in this case. Effectively, this means that C has no security interest in the broadcast license itself, but does have an interest in the proceeds of this license. If D sells the license, or otherwise profits form it, C's interest attaches to those proceeds. However, D continues to control the license, its rights and responsibilities, whether to dispose of it, and so on. The exclusionary clause is

7

undoubtedly a narrow carve out, but it's simply false to suggest that it makes no practical sense or has no commercial value.

Or imagine that two parties, a construction company and a fixture company, have entered into a construction contract. A bank loans money to the construction company and takes a security interest in the proceeds of the contract between the construction and fixture companies, but not in the contract itself. When the construction company defaults, the bank can claim the payments that the fixture company offers to the construction company. But having no security interest in the contract itself, it can't alter the legal relationship between the two companies, nor can it interfere with the rights and obligations that each company has to the other.[3] Again, a clause that eliminates a secured creditor's interest in a contract, lease, or licence, while maintaining the creditor's interest in the proceeds of those agreements could have myriad commercial uses. At any rate, such an exclusionary clause is not, on its face, superfluous, no matter how little commercial value Plaintiff perceives therein.

The confusion about Defendants' supposedly impractical examples and interpretation seems rooted in one assumption: that the exclusionary clause must have somehow significantly impacted the Wells Fargo-LEEP agreement. This is the only way the Court can make heads or tails of Plaintiff's repetitive assertions that this or that of Defendant's arguments don't make sense. In this alternate universe, it matters not that the plain language of the clause applies to commercial agreements–and not manufacturing equipment. Plaintiff has instead constructed a clever disjunction: either the exclusionary

---

[3] This hypothetical is based on *First Nat. Bank & Trust Co. of Stillwater v. McKown*, 867 P.2d 1342 (Okla. App. 1993).

clause applies to the roll former–in which case it makes sense–or it saves only to LEEP's obligation to pay Wells Fargo–in which case a host of absurd results follow and the exclusionary clause is stripped of all practical significance. They hope this maneuver cajoles the Court into accepting the first proposition, lest a federal court breathe life into the absurd. Yet Plaintiff never engages with a third possibility: that the exclusionary clause has about as much practical significance for Fortress's interest in the roll former as does the "Exchange Act" definition in the preceding paragraph. (Doc. #1-7, at 7.).

As seems obvious to the Court, the exclusionary clause applies to a host of transactions and commercial agreements not at issue in this case. Defendants offered some examples in their filings. In an effort to aid the Plaintiff's understanding, the Court offers two more hypotheticals above. At any rate, the Court will not follow Plaintiff and assume that the exclusionary clause is absurd unless it somehow significantly affected Fortress's interest in the roll former. Plaintiff has not convinced the Court of this premise's legitimacy, and the Court finds no reason to accept the same.

**2. Plaintiff's efforts to convince the Court to disregard the exclusionary clause's plain meaning fail.**

Plaintiff advances an additional claim about the Fortress financing agreement that's, quite frankly, confusing. In Schedule 5 of the agreement, LEEP promises Fortress that at the time of closing, the only "lien or encumbrance" on Fortress's property would be the capital lease for the roll former. (Doc. #15, at 7). Apparently this shows that Fortress and LEEP used "lease" to refer both to the lease itself and the property underlying the lease. But the schedule always clearly distinguishes lease from the property securing the lease. The schedule indicates that the only *encumbrance* on LEEP's *property* would be the capital

lease. (Doc. #36-4). The encumbrance in this schedule is the Wells Fargo capital lease; the property is the roll former. The schedule simply never uses lease when it means "roll former." At various times, it refers to the lease as "lien" or an "encumbrance"; meanwhile, it refers to the roll former as "property." Plaintiff labors to establish that "lease" and "roll former" were used interchangeably in the Fortress security agreement. But those efforts simply fail.

The Court allowed Plaintiff (and later Defendants) to further brief this issue, but Plaintiff's additional briefing only serves to reinforce the Court's view that Plaintiff is simply mistaken. In his November 25, 2013 supplemental memorandum, Plaintiff opens with an allegedly significant revelation: that Defense counsel admitted during argument that "Schedule 5 does mention the lien on the roll former; it mentions the capital lease." (Doc. #38, at 1). Plaintiff goes on to note that this amounted to Defense counsel's "admission that the 'mention' of the Roll Former itself is accomplished by the reference to the capital lease in Schedule 5." Defendants admitted nothing of the sort. No one doubts that Schedule 5 mentions the lien on the roll former. Mentioning the *lien* on the roll former is not, however, the same as mentioning the roll former itself. As Defendants note in their reply, to conclude otherwise would require a finding that Defense counsel possesses weak command of the English language. (Doc. #38, at 2).

Plaintiff's latest brief, like his earlier ones, devote considerable effort to convincing the Court that Schedule 5 of the Fortress-LEEP agreement must be harmonized with the excluded property clause. (Doc. #38, at 3). Plaintiff never persuasively argues why Defendants' interpretation of the contract is somehow unharmonious. For instance, Plaintiff, in an earlier filing, notes during a discussion of Schedule 5 that "the plain

10

language of the Fortress Financing Agreement shows that Fortress and LEEP used 'lease' interchangeably with the 'equipment' described in the lease." (Doc. #15, at 7). As noted above, however, Schedule 5 shows precisely the opposite. The provision reads as follows: "No lien or encumbrances of any property other than capital leases will be in effect upon closing."

Plaintiff's misunderstanding is rooted in the contracts' drafting. Specifically, he mistakes the effect of "of any property other than capital leases" upon the meaning of the entire provision. By Plaintiff's reading, "other than capital leases" modifies "of any property," such that the disputed provision should be interpreted as such: "No lien or encumbrance other than those which have as their subject capital leases will be in effect...." In other words, the provision indicates that only those liens *upon* capital leases will be in effect. Since the only lien in effect was on the roll former, then Plaintiff argues that capital lease must mean roll former, at least in this schedule.

The Court reads this provision entirely differently. By the Court's reading, "of any property" modifies "lien or encumbrance," such that the provision should be interpreted as such: "No lien or encumbrance...other than capital leases will be in effect upon closing." By this reading, "of any property" simply narrows and clarifies the reach of the antecedent clause "[n]o lien or encumbrance."

The Court comes to this conclusion because to find otherwise would disregard the plain meaning of the exclusionary clause. Recall the provision's text: "Excluded property shall mean any contract, lease, license or other agreement that contains a provision prohibiting the assignment..." In light of the reference to an "agreement that contains a provision" language, Plaintiff's position is striking. Not only is a roll former a "contract,

11

lease, license or other agreement"–an interpretation which already stretches the bounds of credulity, Plaintiff also apparently means that a roll former could "contain a provision" that prohibits assignment. The Court is admittedly ignorant about the full extent of the industrial uses of a roll forming machine. But certainly the roll former doesn't contain provisions restricting its own assignment.

There is some evidence that LEEP and Fortress intended to exclude the roll former from Fortress's security interest. (Doc. #15, at 11-12). This evidence is circumstantial, at best. And at any rate, under New York Law, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). The terms of the contract are clear, and no evidence is admissible to change the meaning of those terms–certainly not the circumstantial evidence available in the record.

Plaintiff notes that, in the event the Court finds the provision "ambiguous," then the Court should construe the contract against the drafters. Plaintiff's argument is true as far as it goes. New York law does apply this drafting convention. *See Dube v. Horowitz*, 258 A.D.2d 724, 725 (N.Y. App. Div. 1999). The problem is that the contract is not ambiguous for the reasons stated above.

Plaintiff labors to show that Section 6.2 of the Fortress-LEEP agreement provides some context to bolster their interpretation of the excluded property clause. (Docs. #15, at 12; #38, at 5). Plaintiff argues, for instance, "that because Section 6.2(a) deals with equipment, and not with some abstract 'right to make payments,' referencing Excluded Property in Section 6.2(a) would have been pointless if Defendant's position were

accepted." (Doc. #38, at 6). This is just a bald assertion, and the Court doesn't accept it. The section applies to "all collateral"–not just equipment–with a specific qualifier for collateral that is also equipment. Section 6.2(a) reaches beyond equipment. Whatever the excluded property clause means, Section 6.2 doesn't help the Court ascertain it.

Finally, while the Wells Fargo-LEEP agreement specifically prohibited further encumbrance of the roll former, Defendants correctly note that Section 9-407(a) of the New York Uniform Commercial Code specifically voids this type of restraint on alienation. Because of this provision, Wells Fargo's efforts to prevent a further encumbrance were ineffective. Plaintiff again returns to the exclusionary clause, arguing that the clause evidences LEEP's intent to not encumber the roll former. (Doc. #15, at 13). But the terms of the exclusionary clause are clear: they do not apply to the roll former and LEEP signed them. So the Fortress security interest attached to the roll former.

### C. The Settlement and Second Amendment to Lease did not constitute an acceptance in satisfaction of debt under the UCC.

Plaintiff further asserts that when LEEP transferred ownership to Blanken, this constituted an acceptance in satisfaction of debt (also called a strict foreclosure) under Section 620. The Court finds this argument unpersuasive. Under New York law, "the debtor may consent to full strict foreclosure—the complete satisfaction of its debt—either expressly or by implication." *In re CBGB Holdings, LLC*, 439 B.R. 551, 555 (Bankr. S.D.N.Y. 2010). Neither party suggests that LEEP implicitly consented to the strict foreclosure; rather, Plaintiff argues that the Second Amendment to Lease qualifies as a "record authenticated after default" under UCC 620(c)(2)(A), and evidences LEEP's express consent.

13

Plaintiff points to *In re CBGB* to support the idea that a strict foreclosure under Section 620 need not follow rigid formalities. The Court agrees, but that agreement helps Plaintiff little on this issue. *In re CBGB* involved an apparent strict foreclosure involving Kristal Estate (the secured creditor) and CBGB (the debtor). *In re CBGB*, 439 B.R. at 553. After CBGB defaulted, the parties signed an agreement providing that if CBGB failed to cure the default, Kristal Estate could foreclose on the collateral without further notice. *Id.* When CBGB failed to cure, Kristal Estate seized the property. *Id.* at 555-56. The New York court was asked to decide whether the post-default agreement, standing alone, constituted consent by the debtor. *Id.* Ultimately, it held that consent to the strict foreclosure had been given. *Id.* at 556.

Plaintiff correctly notes that the New York court reasoned that a debtor's consent to strict foreclosure is valid so long as there is documentation that debtor contemplates strict foreclosure under Section 620. (Doc. #33 at 9). But Plaintiff fails to point to a shred of evidence that LEEP somehow consented to or even contemplated strict foreclosure. Indeed, as Defendants note, LEEP insisted until recently that they merely leased–and not owned–the roll former. It is impossible for LEEP to consent to transferring ownership to someone else when it doesn't believe it has any ownership in the first place. (Doc. #16, 13-14).

The Court is simply unwilling to take the logical leap required by Plaintiff's arguments on this issue. Ensuring adherence to rigid formalities is not the purpose of the UCC. But Section 620 is only triggered when the debtor offers express consent, and the Court could find no evidence of LEEP's consent in this case. For this reason, there is

14

little doubt that the Second Amended Lease did not constitute an acceptance in full satisfaction of the debt under Section 620 of New York's UCC.

Further, if, as Plaintiff also claims, the transaction triggered Section 610, then all security interests in the roll former were cancelled on November 6, no secured party remained, and thus no party could have "accepted the collateral" under Section 620. Essentially, Plaintiff's two arguments–one that the transaction triggers 620; the other that the transaction triggers 610–are mutually exclusive.

In light of this, and given the lack of evidence that LEEP, Wells Fargo, or Blanken meant to trigger the UCC, the Court cannot accept that Plaintiff's conduct triggered a legal provision that requires express consent. That leaves Section 610–a section that does not require express consent–as the only possible avenue for Plaintiff's arguments that Fortress's security interest was terminated.

### D. Material factual issues remain regarding whether the November 6 transaction triggered Section 610

Plaintiff has raised one issue on which material factual issues remain unresolved: whether the November 6 transaction amounted to a sale or disposition of property under Section 610 of New York's UCC.

There are multiple possible ways to view the November 6 transaction. Perhaps there were two separate transactions, each of which had independent legal significance under the UCC. Maybe, as Plaintiff argues, only a single, three-party agreement to dispose of LEEP's obligation to Wells Fargo occurred. Or perhaps, as Defendants assert, the November 6 transaction does not even fall under the UCC.

The Court is admittedly conflicted, here. Yet based on the facts as pleaded in the various filings, Plaintiff has made a plausible case that UCC Section 610 was triggered on November 6. That provision of New York law is identical to the Uniform Commercial Code, and reads as follows: "After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral." N.Y. U.C.C. Law § 9-610 (McKinney 2013). And under Section 617, a sale, lease, licence, or disposition of collateral discharges any subordinate security interests–including Fortress's security interest that Defendants later acquired. *Id.* at § 9-617. If Fortress lost its security interest, then Fortress could not have assigned to Defendants a first-priority security interest. Consequently, Plaintiff's claims that his superior ownership interest was violated cannot be dismissed.

Defendants argue that Wells Fargo could not have transferred ownership to Blanken, because a "security interest in the roll former...is all Wells Fargo ever had." (Doc. #30, at 7). The Court does not agree. While it is true that Wells Fargo only ever possessed a security interest, the UCC clearly provides methods by which a secured party can, after default, transfer ownership from the debtor to another party to satisfy the debt. In fact, Section 610, the very provision at issue here, provides that a secured party, after default, "may sell, lease, license, or otherwise dispose of any or all of the collateral." UCC § 9-610(a). After LEEP defaulted, Wells Fargo possessed a number of options, and one of them is that Wells Fargo could "dispose" of the property as that term is defined in the UCC.

Defendants also claim that the August 2008 settlement agreement essentially extinguished Wells Fargo's interest in the roll former, such that its only legal rights were those explicitly reserved in the settlement agreement–specifically, to receive $125,000 or

16

to obtain a consent judgment. (Doc. #30, at 3-4). They further take issue with Plaintiff's extreme position that a dismissal with prejudice amounts to a judgment in Plaintiff's favor on all counts. (*Id.* at 4-5). While the Court does not accept that a dismissal with prejudice operates as Plaintiff believes, the Defendant's position, if accepted, just raises further problems.[4] For example, assume that Wells Fargo no longer possessed a security interest in the roll former. This meant that LEEP owned the roll former free of any security interest, with a separate legal obligation arising from the August 2008 settlement. Yet when LEEP and Blanken signed the Second Amendment to Lease, explicit terms of that agreement granted ownership of the roll former to Blanken.

To put the Court's concerns another way, it seems quite obvious that on November 5, 2008, Blanken had no claim of ownership to the roll former. Either LEEP owned it outright or LEEP owned it subject to Wells Fargo's still-valid security interest. However, on November 7, 2008, under the terms of the Second Amendment to Lease, Blanken owned the roll former. Admittedly, there is much the Court does not know about the specifics of the November 6 transaction. But given that ignorance, the Court cannot rule, as a matter of law, that the November 6 transaction did not constitute a "sale" or "other disposition" under Section 610 of the UCC.

On this issue, the parties will be permitted to take discovery. Undoubtedly, the November 6 transaction fails to fit neatly into the UCC's requirements under Section 610. Still, the Court could not find any authority suggesting that Section 610 could apply only if

---

[4] The Court could find no authority under New York law or that of another jurisdiction to support the proposition that a post-default settlement agreement between a creditor and debtor extinguishes the creditor's security interest.

17

certain formalities were observed. That raises factual questions that remain unanswered: What did the parties to the November 6 transaction intend? Did they believe that ownership in the roll former was passing from one party to another? Did they act in good faith?

This last question is particularly pertinent. Plaintiff argues that his failure to notify Fortress of the disposition is ultimately irrelevant because of Section 617(b). To reiterate, that section provides that a good faith transferee takes free of any subordinate security interest, even when the primary creditor fails to notify secondary creditors. But triggering this provision depends on "whether or not the purchase was made in good faith or bad faith." *In re Domestic Fuel Corp.*, 71 B.R. 734, 739 (Bankr. S.D.N.Y. 1987).

Good faith requires observations of commercial standards of fair dealing. Determining what that demands, in context, is a very fact-specific inquiry. *See, e.g.*, Agriliance*, L.L.C. v. Farmpro Servs., Inc.*, 328 F. Supp. 2d 958, 970 (S.D. Iowa 2003) (holding that transferees have a duty to inquire about what they're purchasing in certain circumstances). So even if Section 610 applies, that simply raises another issue–an issue that is even more fact-specific than anything presently before the Court and, consequently, cannot be adjudicated at this stage of the litigation.

### IV.     CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Defendant's Motion to Dismiss (Doc. # 9) is **granted in part** with respect to whether the exclusionary clause prevented Fortress's security interest from attaching to the roll former, **granted in part** with respect to whether the November 6

transaction triggered Section 620 of the New York Uniform Commercial Code, and **denied in part** with respect to whether the November 6 transaction triggered Section 610 of the New York Uniform Commercial Code.

This 27th day of February, 2014.



G:\DATA\Opinions\London\13-47 MOO re DE 9.wpd