**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**AT LONDON**

**CIVIL ACTION NO. 13-47-DLB-HAI**

**ROGER L. BLANKEN**                                                          **PLAINTIFF**


**V.**                       **MEMORANDUM OPINION AND ORDER**


**KENTUCKY HIGHLANDS**                                           **DEFENDANTS**
**INVESTMENT CORPORATION, et al.**

                              ***   ***   ***   ***

**I.      INTRODUCTION**

        This matter is before the Court on Defendants' and Plaintiff's cross-motions for

summary judgment. (Docs. # 95, 96, 97, 98, 100, & 101).   At its core, this tort action

presents a priority dispute between two secured creditors.  Defendant Kentucky Highlands

Investment Corporation, a perfected secured creditor, took possession of and disposed of

the debtor Leading Edge Earth Products, Inc.'s collateral - an industrial roll former - over

the objection of Plaintiff Roger Blanken, an unperfected secured creditor.  Defendants

Kentucky Highlands Investment Corporation ("Kentucky Highlands"), Outdoor Venture

Corporation ("OVC"), and Stearns Manufacturing, LLC, (collectively "Defendants") move

for summary judgment on Plaintiff's conversion, tortious interference, and declaratory relief

claims, arguing that Plaintiff was not the owner of the collateral and that Defendants had

legal justification for the repossession and disposal of the roll former.  Plaintiff also moves

for summary judgment, insisting that he acquired ownership of the roll former under Section

9-620 of the Uniform Commercial Code ("UCC").  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

In 1999, Leading Edge Earth Products, Inc., ("LEEP") purchased an industrial roll former with financing provided by Wells Fargo. (Doc. # 18-1).  Although the Financing Agreement was structured as a traditional lease, with Wells Fargo owning the roll former and leasing it to LEEP, the Agreement contained a provision that allowed LEEP to purchase the roll former at the end of the lease term for only $1. (Doc. # 18-1, 4).  As this Court previously held, this type of "sham lease" transaction is considered a traditional secured transaction under the UCC. (Doc. # 44, 2).  LEEP purchased the roll former, Wells Fargo financed the purchase, and Wells Fargo promptly filed a financing statement in Oregon, where LEEP was incorporated, establishing itself as a perfected secured party with priority.  (Doc. # 18-3, at 45).  LEEP had possession of the roll former for many years and used it in the course of business.

On July 29, 2004, LEEP entered into a Financing Agreement with Fortress Credit Corp. ("Fortress"). (Doc. # 1-7).  That Agreement gave Fortress a security interest in LEEP's assets, including its equipment. (Doc. # 1-7).  Notably, the Agreement excluded certain property from Fortress's security interest, including "any contract, lease, license, or other agreement" that contained provisions restricting further encumbrance. (Doc. # 1-7, 7).  This Court held in its prior Memorandum Opinion and Order that the plain meaning of the exclusionary clause contained in the Financing Agreement did not exclude the roll former from the collateral pledged to Fortress. (Doc. # 44, 4-13).

2

As early as August 2004, LEEP began to fall behind on its payments to Wells Fargo. Shortly thereafter, Wells Fargo filed another financing statement in Oregon to maintain its priority and the effectiveness of the financing statements. (Doc. # 1-8).   Some efforts were made to adjust or delay the lease payments over the next few years, but in April 2008, Wells Fargo sent a letter notifying LEEP that it had defaulted on its roll former payments. (Doc. # 18-5, 24).   A few weeks later, Wells Fargo sued LEEP in the Middle District of Pennsylvania for breach of contract. (Doc. # 18-4).   On August 8, 2008, Wells Fargo settled with LEEP on the condition that LEEP pay Wells Fargo $125,000 within ninety (90) days of settling.   The settlement agreement also provided that if LEEP did not pay Wells Fargo within the agreed upon time frame, the district court would enter a consent judgment against LEEP. (Doc. # 18-5, 32-35).

On November 6, 2008, ninety (90) days after the parties entered into the settlement agreement, multiple transactions occurred.   According to Plaintiff, these were all part of the same agreement between him, Wells Fargo, and LEEP. (Doc. # 32, 5).   As part of these transactions (the "November 6th transactions") Wells Fargo assigned its security interest to Plaintiff, a LEEP shareholder, for $125,000. (Doc. # 1-9).   This extinguished Wells Fargo's interests in the roll former.   On the same day, Plaintiff and LEEP executed a Second Amendment to Lease, which amended the assigned "loan documents" to reduce LEEP's monthly payments, eliminate LEEP's purchase rights, and provide under its terms that Plaintiff was the owner of the roll former. (Doc. # 1-10, 2).

In 2012, Fortress assigned its security interest to Kentucky Highlands and Kentucky Highlands filed a financing statement shortly thereafter. (Doc. # 95-22, Ex. 21).   In December 2012, Kentucky Highlands notified LEEP of its default and expressed an intent

3

to take possession of and dispose of LEEP's assets, including the roll former.  Although Plaintiff sent Kentucky Highlands a letter, in which he claimed ownership and objected to the sale,  Kentucky Highlands repossessed the roll former from LEEP and disposed of it by private sale. (Doc. # 1-12).  Plaintiff immediately filed suit against Defendants.

It seems apparent that Plaintiff and LEEP did not appreciate the legal consequences of the November 6th transactions.  Their transaction was premised on the mistaken belief that Wells Fargo was the true owner of the roll former, and thus, had transferred ownership of the roll former to Plaintiff.  However, Wells Fargo was simply the possessor of a security interest in the roll former that LEEP owned.  As a consequence of this misunderstanding, Plaintiff did not file a financing statement to perfect his interest in the roll former.  Due to Plaintiff's confusion, his arguments do not easily fit within the UCC; however, a party's actions are interpreted in accordance with the UCC's rules, regardless of whether or not the parties were aware of the rules.[1]

Defendants previously filed a Motion to Dismiss Plaintiff's Complaint. (Doc. # 9).  This Court granted Defendants' Motion in part, finding that the exclusionary clause in the Fortress Financing Agreement did not preclude Defendants' security interest from attaching to the roll former. (Doc. # 44)  It also held that the November 6th transactions did not trigger a strict foreclosure under Section 9-620 of the UCC because LEEP had not consented to transferring ownership of the roll former to Plaintiff. *Id.*  Therefore, the Court left only one avenue open for Plaintiff - a disposition of collateral after default under UCC

---

[1]  In the Court's prior Memorandum Opinion and Order, the Court explained that Plaintiff is "trying to fit a square peg (the language used during the November 6 transaction) into a round hole (the UCC)". (Doc. # 44, 4).

Section 9-610. *Id.*

## III.   ANALYSIS

### A.   Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.*  Once a party files a properly supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

### B.   Choice of Law

Before considering the issues raised in the parties' cross-motions for summary judgment, the Court must determine which state's law governs.  The parties pay little attention to the choice of law issue, claiming they can "easily sidestep" the question, but this is a short-sighted approach. (Doc. # 95-1, 2, n.1).  Although the UCC provisions are substantially the same in each of the jurisdictions for which a choice of law argument might be made, this case cannot be disposed of by interpreting UCC provisions.  After all,

Plaintiff's conversion and tortious interference claims sound in tort.[2]  To adequately address Plaintiff's conversion and tortious interference claims, the Court must determine which state's substantive tort law will apply.[3]

As a federal court sitting in diversity, this Court must apply "the choice of law rules of the forum state." *See Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822 (6th Cir. 1996); *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496 (1941).  Accordingly, Kentucky choice of law rules apply.  Under Kentucky law, the first step in a choice of law analysis is to identify the substantive area of law from which the instant claim arises. *See Petro v. Jones*, 2013 WL 756756, *7 (E.D. Ky. Feb. 27, 2013) *citing Miller Truck Lines, LLC v. Cent. Refrigerated Serv., Inc.*, 781 F. Supp.2d 488, 491 (W.D. Ky. 2011).  If the claim sounds in tort, the Court should apply the significant contact test. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009).  The "significant contact test" requires a court to apply Kentucky law "if there are significant contacts - not necessarily the most significant contacts - with Kentucky." *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972).  Thus, the significant contact test is heavily weighted in favor of applying Kentucky law. *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987) (observing that Kentucky courts "are very egocentric or protective concerning choice of law questions")*, overruled on other*

---

[2]  In the Court's prior Memorandum Opinion and Order, NY UCC law was cited throughout.  Although NY UCC law governed the interpretation of the Fortress Financing Agreement (and whether the roll former was excluded property) because of a forum selection clause contained in the Financing Agreement, New York law does not govern whether Plaintiff was the owner of the roll former or Plaintiff's tort claims generally.

[3]  Based on the significant contacts test, there are two states whose law may govern: (1) Kentucky and (2) Pennsylvania (where LEEP has operations and where the roll former was repossessed).  Whether Kentucky law or Pennsylvania law governs, the outcome is the same. *See U.S. Claims, Inc. v. Flomenhaft*, 519 F.Supp.2d 532 (E.D. Pa. 2007).

*grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994).

In the present case, Plaintiff's claims for conversion and tortious interference claims sound in tort. Examining Kentucky's contacts with the case, the Court considers that Defendants reside in Kentucky, the debtor (LEEP) has operations in Kentucky, disposition of the roll former occurred in Kentucky, and the roll former is currently located in Kentucky. Because these contacts with Kentucky are significant, Kentucky law governs this dispute.[4]

### C.    *Nature of the Parties' Interests*

To determine whether summary judgment is appropriate for either party, the Court must first ascertain whether and to what extent the parties have interests in the roll former. When parties have competing secured interests in collateral, Article 9 of the UCC establishes which party's interest takes "priority." Ky. Rev. Stat. Ann. §§ 355.9-317-9-339. Article 9's comprehensive scheme for the regulation of security interests fosters confidence and predictability in commercial transactions by enabling creditors to rely on the perfection and priority rules. However, before Article 9's priority rules can be applied, the Court must determine the nature of the interests held by both Plaintiff and Defendants.

The parties have presented the Court with three versions of this story: (1) what Plaintiff thought was happening on November 6, 2008; (2) what Plaintiff wishes would have happened on November 6, 2008; and (3) what actually happened. As the Court explained

---

[4] Kentucky's UCC also dictates that Kentucky law should govern. *See* Ky. Rev. Stat. Ann. § 355.9-301(1) ("Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.") *See also* Ky. Rev. Stat. Ann. § 355.9-301(2) ("While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessor security interest in that collateral.")

in its prior Memorandum Opinion and Order, although LEEP's Financing Agreement with Wells Fargo was structured as a traditional lease, the "lease" was simply a disguised security agreement under the UCC. (Doc. # 44, 2).  As a result, Plaintiff misunderstood the nature of the November 6th transactions at the time they occurred, believing that he acquired ownership of the roll former from Wells Fargo and leased it to LEEP pursuant to the Second Amendment to Lease.  Accordingly, the Court dismissed the first version of this story - what Plaintiff thought was happening on November 6, 2008.

After becoming aware of the UCC's applicability and requirements, Plaintiff argued that he and LEEP effected a "strict foreclosure" under Section 9-620, which permits a secured party to accept collateral in full or partial satisfaction of the debtor's obligation if the following three requirements are met: (1) consent of the debtor, (2) the creditor's acceptance of the collateral in satisfaction of the debt, and (3) a record authenticated after default in which the terms are agreed upon.  Plaintiff insists that these requirements were satisfied, making him the owner of the roll former and discharging all other security interests, including the interest assigned to Kentucky Highlands.  The Court rejected this argument in its prior Memorandum Opinion and Order, finding that neither the Assignment of Loan Documents nor the Second Amendment to Lease evidenced LEEP's consent to Plaintiff's acceptance of the roll former in satisfaction of its debt. (Doc. # 44).

Despite this finding, Plaintiff continues to claim that the November 6th transactions constituted a strict foreclosure under Section 9-620 and discharged Kentucky Highlands's security interest.  In response, Defendants argue that the transactions did not satisfy the requirements under Section 9-620, and thus, Plaintiff did not acquire ownership of the roll former and their security interest was not discharged.  The Court continues to be

8

unpersuaded by Plaintiff's arguments and rejects the second version of this story - what Plaintiff wishes would have happened on November 6, 2008.

District courts have "authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment;" however, they will do so only when there is "(1) an intervening change of controlling law, (2) new evidence available, or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. App'x 949, 959 (6th Cir. 2004) *citing Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991). Plaintiff appears to rely on the second ground, arguing that his deposition testimony and declaration (Doc. # 96-4 and 96-9), as well as the deposition testimony of LEEP C.E.O., John Nordstrom (reproduced below), prove that LEEP consented to Plaintiff acquiring ownership of the roll former, while LEEP's debt to its other secured creditor (Kentucky Highlands) was eliminated under Section 9-620:

> Q:   So the exhibits we've seen so far show that Wells Fargo assigned the documents to Roger Blanken on November 6, 2008; Roger Blanken wired $125,000 to Wells Fargo on November 6, 2008; and you and Roger Blanken executed the second amendment to the lease that you understood had as its owner of the roll forming equipment Roger Blanken, also on November 6, 2008, correct?
>
> A:   Yes.
>
> Q:   I take it, then, that with the settlement agreement between Leep and Wells Fargo you thought that Wells Fargo owned the roll former, correct?
>
> A:   Yes.
>
> Q:   And then with the assignment from Wells Fargo to Roger Blanken you understood that Roger Blanken owned the roll former, correct?
>
> A:   Correct.

Q:     And you knew in the summer and fall of 2008 that if Wells Fargo didn't get $125,000 it was going to repossess the roll former, correct?

A:     Correct.

Q:     And because Leep couldn't pay Wells Fargo $125,000, you asked Roger Blanken if he would pay it and take ownership, correct?

A:     That's correct.

Q:     Now, when you on behalf of Leep executed the settlement agreement agreeing to pay the $125,000, Leep was in default on its obligations to Wells Fargo, correct?

A:     Yes.

Q:     And so you executed that settlement agreement after default, correct?

A:     Yes.

Q:     And when Roger Blanken paid the $125,000 on Leep's behalf, you then executed the second amendment to the lease also after the default to Wells Fargo, correct?

A:     Yes.

Q:     And at that point you understood that the roll former was owned by Roger Blanken, who was collecting or had a right to collect the lease payments from Leep, correct?

A:     That's correct.
...

Q:     Was it your understanding that ownership of the roll former had passed to Blanken?

A:     Yes, absolutely.

(Doc. # 96-7; Depo. John Nordstrom (Feb. 6, 2015), 94:16 - 97:3.)

Although this testimony establishes that LEEP and Plaintiff both intended for Plaintiff to be the owner of the roll former, such testimony is insufficient to satisfy the requirements of Section 9-620.  Therefore, Plaintiff has failed to establish new evidence sufficient to

10

persuade this Court to reconsider its prior decision dismissing Plaintiff's Section 9-620 theory.[5]

Plaintiff and LEEP intended for Plaintiff to be the owner of the roll former because they believed that Wells Fargo had transferred title to Plaintiff in the Assignment of Loan Documents and that LEEP was simply leasing the roll former.   In fact, the Second Amendment to Lease, which Plaintiff now claims is the "record authenticated after default" required by Section 9-620, explicitly states: "Whereas, Owner obtained from Wells Fargo Equipment Finance, Inc. ("WFEF") of Minneapolis, MN an assignment of documents including title to and a lease of One (1) Bradbury Roll Forming Machine..." (Doc. # 1-10). Thus, the testimony cited proves *only* that Plaintiff and LEEP thought Wells Fargo was the owner of the roll former by virtue of the Assignment of Loan Documents from Wells Fargo to Plaintiff; *not* that LEEP agreed to transfer ownership of the roll former to Plaintiff in satisfaction of the debt via the Second Amendment to Lease.

Moreover, the Second Amendment to Lease does not qualify as a "record authenticated after default" evidencing LEEP's consent to transfer the roll former to Plaintiff in satisfaction of his debt, as required by Section 9-620.   LEEP did not contemplate, much less consent to, a strict foreclosure.  Plaintiff fails to realize that the Court must look to the

---

[5]      In its prior Memorandum Opinion and Order, this Court held: "... Plaintiff fails to point to a shred of evidence that LEEP somehow consented to or even contemplated strict foreclosure.  Indeed, as Defendants note, LEEP insisted until recently that they merely leased - and not owned - the roll former.  It is impossible for LEEP to consent to transferring ownership to someone else when it doesn't believe it has any ownership in the first place. (Doc. # 16, 13-14).

The Court is simply unwilling to take the logical leap required by Plaintiff's arguments on this issue.  Ensuring adherence to rigid formalities is not the purpose of the UCC.  But Section 620 is only triggered when the debtor offers express consent, and the Court could find no evidence of LEEP's consent in this case.  For this reason, there is little doubt that the Second Amended Lease did not constitute an acceptance in full satisfaction of the debt under Section 620..." (Doc. # 44, 14-15).

time of the transaction to determine whether LEEP consented to strict foreclosure. *Post hoc* consent is insufficient.

Black's Law Dictionary defines "consent" as "a voluntary yielding to what another proposes or desires; agreement, approval, or permission regarding some act or purpose..." (Black's Law Dictionary, 10th ed. 2014). With that definition in mind, there is little doubt that LEEP did not consent to a strict foreclosure by Plaintiff. Instead, LEEP consented to Wells Fargo transferring title to Plaintiff. Plaintiff cannot recharacterize LEEP's consent to what it mistakenly believed was happening, into consent for what Plaintiff wishes would have happened, now that they are aware of the UCC's applicability and requirements. In other words, LEEP's belief that title of the roll former had transferred to Plaintiff via the Assignment of Loan Documents cannot be converted into retroactive consent to transfer title to Plaintiff via the Second Amendment to Lease. As this Court held in its Prior Memorandum Opinion and Order - "It is impossible for LEEP to consent to transferring ownership to someone else when it doesn't believe it has any ownership in the first place." (Doc. # 44, 14). Therefore, the Second Amendment to Lease is not a record authenticated after default evidencing an acceptance in full satisfaction of the debt under Section 9-620, and accordingly, ownership of the roll former did not transfer to Plaintiff.

In its prior Memorandum Opinion and Order, the Court left open the possibility that the roll former may have been transferred to Plaintiff pursuant to Section 9-610, which provides that "after default, a secured party may sell, lease, license or otherwise dispose of any or all of the collateral." Ky. Rev. Stat. Ann. § 355.9-610. If the secured party sells or otherwise disposes of the collateral, good faith purchasers for value take all of the debtor's rights in the collateral and take free of the secured party's security interest and all

other subordinate liens and security interests. Ky. Rev. Stat. Ann. § 355.9-617.  However, Plaintiff concedes that the November 6th transactions "did not effect a sale, lease or other disposition" under Section 9-610. (Doc. # 97, 6).[6]

The Court having reaffirmed its previous finding that the November 6th transactions did not constitute a strict foreclosure under Section 9-620, and Plaintiff having conceded that Section 9-610 is inapplicable, the Court is left with only one acceptable version of this story - what actually happened.  In short, Plaintiff obtained a secured interest in the roll former, which he failed to perfect.  Meanwhile, Fortress had a perfected security interest in the roll former, which it assigned to Kentucky Highlands.  Therefore, this case boils down to a rather simple dispute between an unperfected secured creditor (Plaintiff) and a perfected secured creditor (Kentucky Highlands), whose priority is governed by Article 9 of the UCC.

> A perfected security interest ... has priority over a conflicting unperfected security interest...

Ky. Rev. Stat. Ann. § 355.9-322(1)(b).

---

[6]  Even if Plaintiff had not conceded his Section 9-610 argument, he would have failed for two reasons.  First, the Assignment of Loan Documents from Wells Fargo to Plaintiff do not constitute a disposition of collateral that discharges all other secured interests; rather it was simply an assignment of the secured interest. *See* Doc. # 1-9, Complaint, Ex. E ; *see also* Doc. # 95-2 (Depo. of Douglas Hein).  Second, Plaintiff's 9-610 argument would face a large hurdle in overcoming Section 9-617's good faith requirement.  If a disposition of collateral under 9-610 occurred, Plaintiff would take free and clear of all subordinate interests only if Plaintiff acted in "good faith." *See* Ky. Rev. Stat. Ann. § 355.9-617.  Based on the record, the Court believes that the Plaintiff's awareness of the existence of the Fortress Financing Agreement, as well as the fact that Plaintiff is an insider (as a LEEP shareholder), cast doubt on Plaintiff's status as a "good faith" transferee under Section 9-617. *See* Docs. # 95-20 (Ex. 19) and 95-21 (Ex. 20). Furthermore, there are strong policy considerations that arise under this argument.  If shareholders can discharge their corporation's subordinate security interests by purchasing the corporation's assets (collateral) which secure the debt, and then lease the asset back to the corporation (as Plaintiff alleged herein), corporations and their shareholders would easily be able to "pull a fast one" on all of their creditors.  Article 9 does not provide an avenue for such deceptive business tactics.

Accordingly, Defendants have a perfected security interest in the roll former and take priority over Plaintiff, who failed to perfect and has only an unperfected secured interest.

### D. **Plaintiff's Tort Claims**

Now that the Court has determined the nature of the parties' interests in the roll former, Article 9's priority rules can be applied to resolve the parties' dispute. Accordingly, Plaintiff's tort claims will be analyzed as claims brought by an unperfected secured creditor against a perfected secured creditor with priority.

Plaintiff seeks damages for conversion and tortious interference, as well as declaratory relief, against Defendants for actions taken after LEEP's default: (1) taking possession of and (2) disposing of the roll former. However, Article 9 authorizes such action. Specifically, Ky. Rev. Stat. Ann. § 355.9-609(1) permits a secured party to "take possession of the collateral" after debtor's default. Further, a secured party may exercise their rights after default "pursuant to judicial process" or "without judicial process, if it proceeds without breach of the peace." Ky. Rev. Stat. Ann. § 355.9-609(2). If the creditor takes possession of the collateral, he "has two alternatives in dealing with the collateral. He must either sell the property in a 'commercially reasonable' manner with notice provided to the debtor of the sale, Ky. Rev. Stat. Ann. 355.9-504(1), (2), (3), or he may elect to retain the collateral in satisfaction of the debt." *Herring Min. Co. v. Roberts Bros. Coal Co., Inc.*, 747 S.W.2d 616, 619 (Ky. Ct. App. 1988); *See also* Ky. Rev. Stat. Ann. § 355.9-610(1) ("A secured party may sell, lease, license or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing."). If commercially reasonable, "a secured party may dispose of collateral by public or private proceedings, by one (1) or more contracts, as a unit or in parcels, and at any time and

place and on any terms." Ky. Rev. Stat. Ann. § 355.9-610(2).

Plaintiff claims that Defendants' actions in taking possession, and disposing of, the collateral are tortious, despite Article 9's provisions, which authorize those very actions. The Court refuses to impose tort liability when a party acts in accordance with Article 9. To do so would allow a creditor with a subordinate interest to circumvent the UCC's clear rules regarding perfection, priority, default, and enforcement, and more importantly, render Article 9 meaningless. Therefore, to the extent that Article 9 permits Defendants' conduct, Defendants are immune from tort liability for exercising the right to repossess and dispose of collateral as a perfected secured creditor with priority. Accordingly, the Court's inquiry will be limited to whether Defendants acted in accordance with Article 9.

### 1.   Conversion

Conversion is the "wrongful exercise of dominion and control over property of another." *State Auto. Mut. Ins. Co. v. Chrysler Creditor Corp.*, 792 S.W.2d 626, 627 (Ky. Ct. App. 1990). More specifically, the Kentucky Supreme Court has held that a plaintiff must prove the following seven elements to establish a claim for conversion under Kentucky law:

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Ky. Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005); *see also Meade v. Richardson Fuel, Inc.*, 166 S.W.3d 55, 58 (Ky. Ct. App. 2005).

15

As an unperfected secured party with a subordinate interest in the roll former, Plaintiff cannot satisfy the second element, and thus his conversion claim cannot survive. In order to state a claim for conversion, Plaintiff must be able to prove that he had "possession of the property or the right to possess it at the time of the conversion." *McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005).  Although a secured party's interest is sufficient under Kentucky law to bring a conversion claim, Article 9's priority rules come into play in determining whether the plaintiff has the right to possess the property at the time of the conversion. *See e.g. Ranier v. Gilford*, 688 S.W.2d 753 (Ky. Ct. App. 1985) (holding that the UCC recognizes a secured creditor's right of action for wrongful conversion of collateral against transferee of original debtor); *Gen. Motors Acceptance Corp. v. Lincoln Nat'l Bank.*, 18 S.W.3d 337 (Ky. 2000) (holding that creditor's security interest in proceeds of its collateral took priority over bank's right to apply proceeds as setoff under Kentucky's UCC, and thus bank was liable to creditor for conversion); *Meade v. Richardson Fuel, Inc.*, 166 S.W.3d 55 (Ky. Ct. App. 2005) (holding that plaintiff's failure to comply with the requirements of Article 9 in protecting her interest, precluded plaintiff from prevailing on conversion claim).

The Western District of Kentucky recently considered the interplay between conversion claims and Article 9 priority rules in *CNH Capital Am., LLC v. Hunt Tractor, Inc.*, 3:10-CV-00350, 2015 WL 5554020 (W.D. Ky. Sep. 21, 2015). In *CNH Capital*, there were several competing interests at stake - Commonwealth Bank, with a security interest in the funds deposited in a checking account, and CNH Capital America, LLC, with a purchase-money security interest in the collateral and the proceeds.   Pursuant to Kentucky's UCC, a bank has "superior-priority" in the rights of a deposit account. *See* Ky. Rev. Stat. Ann. §

355.9-327.   Examining the competing interests, the Court found that the success of plaintiff's conversion claim was dependent upon Article 9's priority rules, but determined that Commonwealth Bank's "super-priority" did not prevent CNH from bringing a conversion claim because "priority disputes only arise upon default." *CNH Capital*, 2015 WL 5554020, at *4.  Although Commonwealth Bank would have "prevailed over CNH in a priority dispute over the funds," the debtor had not defaulted on his obligations to Commonwealth Bank, and thus, CNH, a creditor with a subordinate interest, was permitted to bring a conversion claim. *Id.*

In the present case, Plaintiff, an unperfected secured creditor with a subordinate interest, did not have the right to possess the roll former at the time of the conversion. Instead, because of LEEP's default and Defendants' superior interest, Defendants had the right to possess the roll former.  Unlike *CNH Capital*, LEEP defaulted on its obligation to Kentucky Highlands.  Thus, Article 9's priority rules determine which party has "the right to possess" the collateral, and which party has the requisite interest to bring a conversion claim.  Because Defendants' superior interest prevails over Plaintiff's subordinate interest in the roll former, Plaintiff did not have "the right to possess" the roll former and his showing on this necessary element is precluded by Article 9's priority rules.

Defendants complied with the UCC, perfected its security interest, and obtained priority; therefore, its interests are superior to Plaintiff's interest.  Allowing Plaintiff, the holder of a subordinate interest, to bring a conversion claim against Defendants, a perfected secured creditor with a superior interest, would allow Plaintiff to proceed in tort in direct contradiction with Article 9's comprehensive statutory scheme - a result this Court will not permit.  Therefore, there is no genuine dispute of material fact as to whether a

conversion occurred and Defendants are entitled to summary judgment.[7]

### 2.    Tortious Interference

Under Kentucky law, "tort liability exists for the interference with a known contractual relationship, if interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991); *see also Brett v. Media Gen. Operations, Inc.*, 326 S.W.3d 452 (Ky. Ct. App, 2010).  Plaintiff bears the burden of establishing that Defendants acted without justification. *See Bourbon Cnty. Joint Planning Comm'n v. Simpson*, 799 S.W.2d 42 (Ky. Ct. App. 1990).  Thus, "a party may not recover ... in the absence of proof that the opposing party 'improperly' interfered with his prospective contractual relation." *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 858 (Ky. 1988).  It is not improper interference if the "alleged interferer has acted in good faith to protect a legitimate interest of his own." *Simpson*, 799 S.W.2d at 45 *citing Hornung*, 754 S.W.2d at 858.  Article 9 authorizes a secured party to take possession of and dispose of collateral to protect its secured interest. *See* Ky. Rev. Stat. Ann. §§ 355.9-609 & 9-610.

Defendants argue that Plaintiff cannot prevail on his tortious interference claim because Defendants acted with justification, provided by Article 9, in taking possession of and disposing of the roll former. (Doc. # 98, 21-22).  On the other hand, Plaintiff asserts that there is no genuine dispute as to the justification element, because "the defendants' actions were neither privileged nor justified." (Doc. # 96-1, 23).  Plaintiff explains:

---

[7]      To the extent Plaintiff claims Defendant is liable in tort for their non-compliance with the UCC's notice requirements, the Court finds the Plaintiff's argument is without merit. First, Ky. Rev. Stat. Ann. § 355.9-611 does not require an unperfected secured creditor to be notified before disposition of collateral.  Moreover, Plaintiff became aware of Defendant's intention to repossess and dispose of the collateral before the private sale, as evidence by Plaintiff's Exhibit G, attached to the Complaint. (Doc. #1-12).

"[b]ecause Blanken's strict foreclosure of the roll former terminated Fortress's security interest, the defendants had no justification to repossess the roll former from LEEP." *Id.* Defendant further claims that Defendants were not justified because they "acted in bad faith" by going "behind LEEP's back to buy up its debt in a scheme to obtain its assets" and then disposing of the roll former by private sale to OVC, "an arrangement commercially unreasonable at best, and underhanded at worst." *Id.* at 23-24.  In support of this assertion, Plaintiff directs the Court's attention to deposition testimony and notes of Thomas Atkins, the attorney who represented LEEP in joint venture negotiations with OVC, prior to Kentucky Highlands obtaining Fortress's secured interest. (Doc. # 96-1, 23; Doc. # 96-17).

The Court is unpersuaded by Plaintiff's first argument - that Defendants *took possession* of the roll former without legal justification.  To the extent Plaintiff relies on his claim to ownership of the roll former under Section 9-620, the Court has repeatedly rejected that argument.  Plaintiff's bad faith argument is equally unavailing because the evidence Plaintiff has presented fails to produce a genuine issue of material fact.  At most, Mr. Atkins's notes and deposition testimony establish that his "mental impression" was that "OVC had no intention of doing this deal" and "wanted to structure a deal that would force LEEP to default " so "they would have control" of LEEP's equipment. *Id.*

This evidence is insufficient to create a genuine issue of material fact.  Although this Court has a "duty to view the facts in the light most favorable to the nonmovant," this Court is not required or permitted "to accept mere allegations." *Chappel v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).  Because Plaintiff has not presented any specific facts  which would negate Defendants' justification in repossessing the roll former, Defendants are entitled to summary judgment on Plaintiff's claim that Defendant's repossession of the roll

former constitutes tortious interference.

Moreover, this result is demanded by Article 9.  Section 9-609 clearly grants a secured party the right to take possession of collateral after a debtor's default.  Allowing perfected secured creditors with priority to be tortiously liable for acting in accordance with the UCC would be wholly irrational.  Other courts have reached the same conclusion, including the Eighth Circuit[8] and the Federal District Court for the Eastern District of Pennsylvania.[9] In Pennsylvania, coincidentally where Defendants repossessed LEEP's roll former, the District Court declared that "Article 9 renders" a secured party with priority "immune from tortious interference liability absent any allegations of illegality or fraud." *U.S. Claims. Inc. v. Flomenhaft*, 519 F. Supp. 2d 532, 539 (E.D. Pa. 2007).  Further discussing the purpose of Article 9 and its interaction with tort law, the *Flomenhaft* Court thoughtfully opined as follows:

> Article 9's carefully crafted statutory scheme was intended to institute a bright-line rule in favor of the most diligent creditor without turning every priority dispute into a fact intensive case-by case subjective inquiry into what one creditor may or may not have known about another's interest. *See* UCC § 9-322, cmt. 3 ("[t]he [priority] rules may be regarded as adaptations of the idea, deeply rooted at common law, of a race of diligence among creditors").  The statutes are clear that a creditor's subjective knowledge is entirely irrelevant to determining the relative priority of the competing interests. UCC § 9-322, cmt. 4, ex. 2.  Even if the later creditor makes his advance on the same collateral with knowledge of another's prior unperfected competing interest, he will still be awarded priority under Article 9 so long as he is the first to perfect. UCC § 9-324, cmt. 4, ex.3.  Article 9's drafters explained that such a rule "is premised on the belief that [the unsecured creditor's] failure

---

[8]  *Noble Sys. Corp. v. Alorica Central, LLC*, 543 F.3d 978 (8th Cir. 2008) (holding that senior creditor had no duty to observe and abide by debtor's contract with junior creditor, and thus senior creditor did not tortiously interfere with junior creditor's business relationship with debtor by foreclosing on its assets and selling them to third party, even if senior creditor knew that junior creditors would not have their claims satisfied at foreclosure sale, where debtor derived no benefit from foreclosure).

[9]  *U.S. Claims, Inc. v. Flomenhaft*, 519 F. Supp.2d 532 (E.D. Pa. 2007).

to file could have misled the subsequent creditor. *Id.*  However, the drafters made clear that whether one was actually misled is immaterial."

*Flomenhaft*, 519 F. Supp. 2d at 536-537.

In conclusion, the *Flomenhaft* court held that under the facts alleged by the junior creditor, the senior creditor with priority had committed no torts because the senior creditor "was the more diligent creditor and its interests are superior to those of Plaintiffs." *Id.* at 538.   Furthermore, "[p]ermitting Plaintiffs, unperfected creditors, to assert" tort claims against "a perfected creditor with a superior interest, would allow an end run around the UCC's clear priority rules; it would give Plaintiffs a remedy in common law based on a claim for which the UCC statutes have expressly precluded relief," and therefore, plaintiffs' claims failed as a matter of law. *Id.*[10]  This Court agrees with the results reached by the Eastern District of Pennsylvania, as well as the Eighth Circuit.  Kentucky Highlands was the "more diligent creditor" and ensured that its secured interest took priority by perfecting in accordance with Article 9 - such conduct cannot be characterized as tortious.

However, the Court's inquiry does not stop there.  To avoid tort liability, Kentucky Highlands must have also *disposed* of the roll former in accordance with Article 9. Defendants insist that there was compliance with Section 9-610, which provides: "If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms." Ky. Rev. Stat. Ann. § 355.9-610.  But, Defendants overlook a key requirement of Section 9-610: *"if commercially reasonable."*  Kentucky's UCC provides

---

[10]  It is worth noting that the Court in *Flomenhaft* concluded that Article 9 precluded Plaintiffs, as unperfected secured creditors, from bringing both conversion and tortious interference claims against, Defendant, a perfected secured creditor with priority - the very same conclusion this Court reached.

additional guidance for the determination of whether the secured party's disposition was "commercially reasonable." *See* Ky. Rev. Stat. Ann. § 355.9-627(2).  Specifically, "a commercially reasonable disposition is one that is made (a) in the usual manner on any recognized market; (b) at the price current in any recognized market at the time of disposition; or (c) otherwise in conformity with reasonable commercial practices among dealers in the type of property which was the subject of the disposition." *Id.*

Under Kentucky law, the secured party has the burden to show that it acted with commercial reasonableness. *Owens v. First Commonwealth Bank of Prestonsburg, Ky.*, 706 S.W.2d 414 (Ky. Ct. App. 1985).  Although the fact that a greater amount could have been obtained "is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner," it is relevant to a determination of commercial reasonableness. *School Supply Co. v. First Nat'l Bank of Louisville*, 685 S.W.2d 200, 204 (Ky. Ct. App. 1984), *abrogated on other grounds by McCoy v. Am. Fidelity Bank & Trust Co.*, 715 S.W.2d 228 (Ky. 1986).  But, a "great disproportionate difference between the value of the property and what was realized by sale" will give rise to a "presumption of 'commercial unreasonableness,'" which the creditor will have to overcome. *Id.*

In this case, genuine issues of material fact remain as to Plaintiff's argument that Defendants *disposed* of the roll former without legal justification.  While Section 9-610 authorizes a secured party to dispose of the collateral after default, that disposition must be "commercially reasonable," and it is far from clear that Defendants' disposition complied with this requirement of Article 9.  The most the Court can locate in the record regarding the disposition of the roll former is a letter from Kentucky Highlands to LEEP providing notice of its intent to repossess and dispose of the roll former; it does not provide any

description or further details of the proposed disposition. (Doc. # 1-11).  At this juncture, the Court does not know if the roll former was sold in the usual manner, in a recognized market, or in conformity with reasonable commercial practices, because the record is completely devoid of details of the disposition, including the price, timing, and terms of the disposition.   Therefore, Defendants have failed to meet their burden of proving the disposition of the roll former was "commercially reasonable" and summary judgment is inappropriate on this narrow issue.

### E.   Request for Declaratory Relief

In his Amended Complaint, Plaintiff seeks a declaration that the Defendants did not possess any right, claim, or interest in the roll former.  Plaintiff's requested declaration must be rejected based on this Court's findings, detailed above, as well as those contained in its prior Memorandum Opinion and Order.  Defendants possessed a superior interest in the roll former and acquired priority under Article 9.  Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's claim for declaratory relief.

## IV.   CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 95) is **granted** with respect to Plaintiff's declaratory judgment and conversion claims and **denied** with respect to Plaintiff's tortious interference claim, because there is a genuine issue of material fact as to whether Defendants' disposition of the roll former was commercially reasonable.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. # 96) is **denied in full**.

This 25th day of January, 2016.



Signed By:

_David L. Bunning_

United States District Judge

J:\DATA\ORDERS\London\2013\13-47 MOO re Summary Judgment.wpd